## Commonwealth vs. Matthew Streeter.

No. 07-P-300.

Suffolk. December 17, 2007. - March 25, 2008.

Present: Cowin, Brown, & Kafker, JJ.

*Controlled Substances. Search and Seizure,* Plain view, Affidavit, Warrant, Probable cause. *Probable Cause. Firearms.*

Discussion of the analytical approach in determining whether police officers may conduct a limited search of a home to secure it to prevent the destruction of evidence while the officers seek a search warrant. [435-436]

A Superior Court judge erred in allowing the criminal defendant's motion to suppress evidence of marijuana and a firearm police officers seized from his apartment prior to obtaining a search warrant for marijuana, any implements and paraphernalia related to the use and sale of marijuana, and firearms or ammunition, where the officers had probable cause to believe that there was marijuana inside the apartment, given the strong odor of marijuana emanating from its interior, the defendant's admission that he had smoked marijuana, and his nervous, evasive behavior in the hallway [436-437], and where the officers had specific information supporting an objectively reasonable belief that the marijuana would be removed or destroyed unless they entered the apartment to secure it from within [437-438]; further, although the officers were authorized to perform a limited search of the apartment to determine that no one else was present who could have either destroyed the evidence or presented a danger to the officers, and that search yielded a plain view of the marijuana, the officers' authorization did not encompass the unlawful external search of a canvas bag — which contained a gun — on top of the kitchen cabinet [438-440]; nevertheless, the affidavit supporting the subsequently obtained search warrant, after excision of evidence relating to the firearm, was adequate as to the marijuana [440], and the firearm was also admissible, where it would have certainly turned up pursuant to the authorized search for narcotics, and where the character of the constitutional violation, an unauthorized feel of a bag, was not severe enough in the circumstances to require suppression [440-441].

Indictments found and returned in the Superior Court Department on August 19, 2004.

A pretrial motion to suppress evidence was heard by *Elizabeth B. Donovan,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Judith A. Cowin*, J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by her to the Appeals Court.

*John P. Zanini*, Assistant District Attorney, for the Commonwealth.

*Derege B. Demissie* for the defendant.

KAFKER, J. The strong aroma of marijuana emanating from an apartment led police to knock on its front door and announce their presence. The nervous behavior and evasive answers of the defendant, Matthew Streeter, and the known presence of others in the apartment resulted in the police requiring the locked apartment to be opened and a limited search to be conducted, prior to obtaining a search warrant. Inside the apartment they saw marijuana in plain view, and one officer felt a gun in a closed bag. At issue is whether the evidence obtained from inside the apartment should have been excised from the search warrant affidavit, and whether the affidavit, shorn of improper information, provided probable cause to search the apartment. The motion judge suppressed the evidence. We reverse.

1. *Background.* The findings of fact of the motion judge are summarized below. On August 12, 2004, Boston police Officer Gregory Brown and two other officers, Craig Jones and Larry Celester, entered 11 Abbot Street, a three-story brick apartment building containing six to twelve units. The officers had received a radio dispatch call regarding a home invasion of apartment twelve, which is located on the third floor. As they proceeded up the stairs to apartment twelve, the officers smelled fresh marijuana emanating from apartment six on the second floor, but chose to continue investigating the home invasion. After knocking twice on the door of apartment twelve and receiving no response, the officers contacted the dispatcher, discontinued the immediate investigation, and descended the stairs. While passing apartment six again, the officers "got a stronger odor of the marijuana coming from inside."

Apartment six has two doors, a front door and a rear door, that enter into the same hallway. The officers knocked on the front door. A male voice from inside asked who it was, and the officer "announced his office and asked if he could speak." Of-

ficer Brown heard "what appeared to be people running around the apartment." Upon receiving no response to his inquiry, he knocked again. The defendant then opened the rear door and stepped into the hallway, locking the door behind him. He wore only a pair of jeans with no shirt or shoes, and appeared nervous and shaking. His eyes were darting around, and he had difficulty speaking.

Believing that there was still someone inside the apartment, Officer Brown asked the defendant if anyone else remained inside. The defendant responded that his four year old daughter was the only person in the apartment. When the officer asked if the defendant had keys to the apartment, he said no. Officer Brown also said that he could smell fresh marijuana, and the defendant responded that he had smoked marijuana earlier. Officer Brown said no, that he smelled fresh marijuana (rather than burned marijuana) coming from inside the apartment. Officer Brown has sufficient experience to distinguish between fresh and burned marijuana.

When asked again if there was anyone else in the apartment besides his daughter, the defendant replied that his friend was inside. The defendant was "instructed to have his friend open the door." The defendant's friend, Lorenzo Bryant, opened the rear door.

The rear door opened into the kitchen, and a kitchen table approximately six to eight feet from the open door was visible from the hallway. While standing in the hallway, Officer Brown noticed two bags of marijuana and two cigar boxes containing loose marijuana and seeds on the table. He also saw a little girl crying. Officer Brown entered the apartment, picked up the little girl, and gave her to the defendant, who was still in the hallway. While Bryant and the defendant were in the hallway, Officers Brown and Celester "did a protective sweep of the apartment." During the sweep, the officers entered the kitchen, the living room, one bedroom (and possibly a smaller bedroom), and a bathroom. Officer Celester picked up a blue canvas bag on top of a cabinet in the kitchen, and felt it with two hands. He believed that there was a gun in the bag, but did not open the bag.

Both the defendant and Bryant were in the hallway throughout

this investigation. After the protective sweep, the officers placed both the defendant and Bryant under arrest for possession of marijuana. The officers then "froze" the apartment while they obtained a search warrant.

The search warrant affidavit, which was drafted by Detective George Cardoza,[1] states as follows: Officer Brown "smelled a strong aroma of marijuana emanating from apartment [six]" while investigating an alleged home invasion in apartment twelve of the same building. The "aroma grew stronger" as the officer approached the door. After "knock[ing] and announc[ing] his office[,] Officer Brown could hear movement inside the apartment." An occupant, who later identified himself as the defendant, then "exited the apartment from the rear door, which is adjacent to the front door and locked the door behind him." When asked if anyone else was in the apartment, the defendant was "evasive." He finally said "that his little girl was inside." "Officer Brown asked if he had keys to the apartment, and the [defendant] said he did not have any keys." When asked "why he would lock his daughter in the apartment with the keys, the [defendant] stated that his friend was also inside. Officer Brown asked the [defendant] if his friend could open the door. The friend . . . opened the rear door and Officer Brown observed in plain view on the kitchen table two shoe boxes with what appeared to be plant seeds and a green leafy substance. Officer Brown also observed clean plastic baggies that appeared to be cut, a small plastic bag containing a green leafy substance and cigar blunts." Based on his experience as a narcotics officer, which was recounted in the affidavit,[2] Officer Brown "believed the plant seeds

---

[1]As explained in the affidavit, Detective Cardoza arrived at the scene after Officers Brown, Jones, and Celester had secured the apartment and performed a protective sweep. Detective Cardoza states in the affidavit that he was lead investigator in over 100 drug cases, performed more than fifty undercover purchases of controlled substances, and participated in over 300 drug arrests. Based on his training and experience, he believed the seeds and green leafy substance to be marijuana and the baggies to be packaging for the sale of marijuana.

[2]As explained in the search warrant affidavit, since becoming a police officer in 1988, Officer Brown has participated in over 500 drug arrests, and has made undercover purchases of narcotics, has led investigations, and has served as an expert witness.

to be marijuana seeds, the green leafy substance to be marijuana, [and] the cut plastic baggies to be packaging used in the sale of marijuana." The officers also "observed [the defendant's] four . . . year old daughter . . . sitting in the corner of the living room crying. The[] officers then removed the child from the apartment . . . [and] seized the apartment and performed a protective sweep." During this sweep, "Officer Celester observed a large blue canvas bag on top of the cabinets in the kitchen. ˙. . . [B]elieving that the bag may contain marijuana or a weapon [the officer] frisked the bag and felt what he believed to be a firearm, possibly a shotgun, inside the bag."[3]

That same day, August 12, 2004, the warrant was issued to search the apartment for marijuana, any implements and paraphernalia related to the use and sale of marijuana, and firearms or ammunition. At 10:30 P.M., the officers executed a search that recovered both boxes of marijuana on the table, a small plastic bag containing marijuana and money, and another bag containing marijuana residue. Additionally, the gym bag was opened, revealing a twelve-gauge sawed-off shotgun. Several rounds of ammunition were also found, along with a nine millimeter magazine and papers belonging to the defendant.

On August 19, 2004, the defendant was indicted by a grand jury for possession of a sawed-off shotgun, a large capacity firearm, and possession of a firearm without a firearms identification card in violation of G. L. c. 269, § 10(*c*), 10(*m*), and 10(*h*), respectively, and possession of a class D controlled substance in violation of G. L. c. 94C, § 34. On March 31, 2005, the defendant moved to suppress the evidence seized from the apartment.[4]

After a hearing held on October 7, 2005, the motion to suppress this evidence was allowed on October 13, 2005. Applying *Commonwealth* v. *DeJesus*, 439 Mass. 616, 621 (2003), the

---

[3]The warrant does not mention Officer Brown's ability to detect the difference in smell between fresh and burned marijuana, nor does the affidavit make that distinction when describing what marijuana Officer Brown smelled. The affidavit also does not state that the defendant and Officer Brown discussed the difference in smell and that the defendant admitted to smoking marijuana.

[4]The defendant also moved to suppress statements made to the officers outside his apartment. This motion was denied and is not the subject of the present appeal.

motion judge concluded that the police should not have entered the apartment prior to seeking to obtain a search warrant because there was not specific information to support an objective reasonable belief that evidence would be destroyed unless such preventive measures were taken. Therefore the evidence they observed inside the apartment would have to be excised from the search warrant affidavit, and without such evidence the affidavit did not establish probable cause. The Commonwealth filed a motion to reconsider on December 5, 2005, which was denied. A single justice of the Supreme Judicial Court allowed the Commonwealth to pursue an interlocutory appeal, and reported the case to this court. The Commonwealth's appeal in this court was docketed on February 26, 2007. We reverse the decision allowing the motion to suppress.

2. *Analytical framework.* In *DeJesus*, 439 Mass. at 621, the Supreme Judicial Court set out the substantive standards and analytical approach applicable to this case. The court emphasized that "[t]he right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment [to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights] was designed to circumscribe by the general requirement of probable cause." *Id.* at 619, quoting from *Commonwealth* v. *Forde*, 367 Mass. 798, 805 (1975). Establishing probable cause to believe that evidence of criminal activity would be found in the home was, the court held, only the first step in the analysis. *DeJesus, supra.* A nonconsensual entry and search, prior to obtaining a warrant, requires exigent circumstances. *Ibid.*

In *DeJesus*, 439 Mass. at 620-621, however, the court went on to address the issue whether officers could conduct a limited search to secure the home to prevent the destruction of evidence while the officers went and sought a search warrant. In analyzing this question, the court stressed that there was a "fundamental difference between securing or controlling the perimeter of a dwelling from the outside and the entry and physical surveillance of a dwelling from the inside." *Id.* at 621. The court therefore concluded that "police officers who secure a dwelling while a warrant is being sought in order to prevent destruction

or removal of evidence may not enter that dwelling, in the absence of specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken." *Ibid.*

The court then held that, while the officers in that case "clearly had a right to control the premises from the outside until a search warrant was obtained, they had no basis for believing that immediate entry was necessary to prevent the destruction of evidence." *Id.* at 623. In *DeJesus,* 439 Mass. at 623-624, however, the defendant was arrested on the street, not outside the door of his apartment, and when the officers went to the apartment, there was apparently no one inside it. The court therefore excised the information obtained from the entry into the apartment from the affidavit. *Id.* at 625. It did, however, conclude that there was sufficient evidence in the affidavit, even after it was excised of improperly obtained information, to provide probable cause for a search, and thus the search was independently supported and exclusion of the evidence was unwarranted. *Id.* at 627. We adopt the same step-by-step approach in the instant case.

3. *Probable cause to search and specific information to secure from within.* We consider first whether the officers in the instant case had probable cause to believe that there was evidence of illegal narcotics in the apartment, and then whether they had specific information to support an objectively reasonable belief that evidence of the illegal activity would be removed or destroyed unless the police entered and secured the apartment prior to seeking a warrant. See *DeJesus,* 439 Mass. at 621. In doing so, "we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990). *Commonwealth* v. *Eckert,* 431 Mass. 591, 592 (2000). However, we "independently review the application of constitutional principles to the facts." *Commonwealth* v. *Torres,* 433 Mass. 669, 671 (2001).

The officers were legally in the hallway of the apartment building investigating a report of an unrelated crime when they first smelled the marijuana emanating from the defendant's apartment. See *Commonwealth* v. *Boswell,* 374 Mass. 263, 269 (1978) (no violation of defendant's expectation of privacy by

officers conducting investigation in common hallway). When they returned to the apartment, they smelled an even "stronger odor of the marijuana coming from inside." The odor was described by a trained narcotics officer as the smell of fresh, not burned, marijuana. As was their right, the officers knocked on the door and announced their office. *Ibid.* See *Commonwealth* v. *McAfee*, 63 Mass. App. Ct. 467, 476 (2005), quoting from *Commonwealth* v. *Murdough*, 428 Mass. 760, 763 (1999) (police allowed to make "inquiry of anyone they wish and knock on any door, so long as they do not implicitly or explicitly assert that the person inquired of is not free to ignore their inquiries"). Officer Brown heard what he thought to be "running around" in the apartment. After the officer knocked again, the defendant came out the rear door and locked himself outside the apartment without a key. He was wearing only jeans, and appeared nervous and shaky. He admitted to smoking marijuana earlier in the day. He was also evasive — he initially told the officers that only his daughter was inside but, when pressed, admitted that his friend was in the apartment with his daughter.

Here, the strong odor of marijuana emanating from the inside of the apartment, the admission by the defendant that he had smoked marijuana, and his nervous, evasive behavior in the hallway provided probable cause to believe that there was marijuana in the apartment. See, e.g., *Commonwealth* v. *Cohen*, 359 Mass. 140, 145 (1971) (odor of marijuana detected from outside apartment combined with statements about narcotics overheard from within apartment were sufficient probable cause to believe that felony was being committed within).

The question then becomes whether the officers had "specific information supporting an objectively reasonable belief that evidence" of the illegal activity in the apartment would be "removed or destroyed" unless the officers took "preventative measures" beyond securing the perimeter of the apartment. *DeJesus*, 439 Mass. at 621. In the instant case, the officers instructed the defendant to have the locked door opened and then conducted a limited search of the apartment in the course of what they called a "protective sweep."

A prerequisite for securing a dwelling from within requires

"an objectively reasonable belief that someone is inside." *DeJesus*, 439 Mass. at 624 (police entry to secure dwelling was improper without any evidence that anyone was inside defendant's apartment). Here, the prerequisite is satisfied by the defendant's admission that Bryant was inside the apartment.

Because the prerequisite was met, we must decide whether, prior to entry of the dwelling, the officers had "specific information supporting an objectively reasonable belief that evidence [would] indeed be removed or destroyed unless preventative measures [were] taken." *Id.* at 621. In *McAfee*, 63 Mass. App. Ct. at 475, this court determined that the *DeJesus* standard for entry to secure a dwelling and conduct a protective sweep was met when, in response to a warrantless knock and announce, the defendant declined to speak, turned and walked quickly back into the apartment.[5]

In the instant case, there was sufficient "specific information" to support the objectively reasonable belief that the marijuana would be removed or destroyed unless the police entered the apartment. After knocking on the defendant's door and announcing their office, the officers heard running sounds within the apartment. The defendant initially stated that only his daughter was in the apartment, but eventually admitted that Bryant was inside as well. The defendant also locked himself and the officers out of the apartment during their conversation. From this information, we conclude that the officers had specific information to support an objectively reasonable belief that the marijuana could be destroyed by Bryant if they did not enter the apartment. Therefore, the entry into the defendant's apartment was reasonable as a means of securing it from within.

4. *Evidence observed during limited search.* Once Bryant opened the door and stepped into the hallway, the officers stand-

---

[5]In *McAfee*, 63 Mass. App. Ct. at 476-477, this court ultimately concluded that the limited warrantless search was not justified, as there was no reason why the officers had not previously obtained a warrant and no reason why they presented themselves on the defendant's doorstep that night. The instant case is distinguishable as the officers had no prior connection with the defendant before walking by his apartment and smelling the marijuana. See *Commonwealth* v. *Cohen*, 359 Mass. at 144-145 (while police had checked out building in past, they had not had previous opportunity to obtain warrant; at time of search, "police [had gone] to the apartment building to quell a disturbance, not to conduct a previously planned raid").

ing in the doorway noticed two bags of marijuana and two cigar boxes that contained loose marijuana and seeds on the kitchen table in plain view. The officers observed the marijuana without seizing it, then used this observation in the affidavit to obtain a search warrant.

"[P]lain view observation involves no intrusion into an area in which the defendant has a reasonable expectation of privacy." *Commonwealth* v. *Sergienko*, 399 Mass. 291, 294 (1987). However, the police must lawfully be in a position from which to view the object. *Commonwealth* v. *D'Amour*, 428 Mass. 725, 731 (1999). Here, we have determined, based on the judge's findings of fact at the motion to suppress hearing, that the officers were lawfully in the hallway and within their rights to instruct that the door be opened when they observed the marijuana on the table. Therefore, the officers' plain view observation of the two bags of what appeared to be marijuana and the two cigar boxes containing what appeared to be loose marijuana and seeds on the table were appropriately included in the search warrant affidavit. See generally *Commonwealth* v. *Villar*, 40 Mass. App. Ct. 742, 745 (1996) (officers viewing cocaine inside apartment from hallway made permissible plain view observation because officers were lawfully in hallway during observation).

Officer Brown next did what was referred to as a "protective sweep" of the apartment while the defendant, his daughter, and Bryant were in the hallway. During the sweep, Officer Celester picked up a blue canvas bag on top of the kitchen cabinet and felt it with both hands without opening it.[6]

"Securing the premises [from within] interrelates closely with the concept of a 'protective sweep' . . . of the premises to ascertain that no one remains inside who might render the premises insecure and destroy the evidence or cause harm to the police." Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 6-6, at 6-16 (2006-2007 ed.). Although the officers were allowed to perform a limited search of the apartment to determine that no one else was present who could have

---

[6]It is not clear exactly when in the course of the protective sweep that the officers came across the canvas bag. We infer, from their decision not to secure or move it during the sweep, that the officers had already concluded that the apartment was empty when they felt its contents.

either destroyed the evidence remaining in the apartment or present a danger to the officers, this limited authorization did not encompass the external search of the canvas bag on the top of the cabinet. *Maryland* v. *Buie*, 494 U.S. 325, 335 (1990).[7]

5. *Adequacy of affidavit after excision.* We next consider the adequacy of the affidavit after excising the evidence relating to the firearm. See *DeJesus*, 439 Mass. at 624-625; *McAfee*, 63 Mass. App. Ct. at 478. As provided in the four corners of the affidavit, Officer Brown, a trained narcotics officer, smelled a strong aroma of marijuana emanating from the apartment. That aroma grew stronger as he approached the door of the apartment. When the defendant appeared out of a different door, he locked that door behind him and gave evasive answers regarding whether anyone remained inside the apartment. He then admitted that his daughter was inside the locked apartment. When asked if he had keys to the apartment he said no. When asked why he would lock his daughter in the apartment without retaining the keys, he then told the officers that his friend was inside.

The strong aroma of marijuana emanating from the apartment, the exit from a different door from the one on which the police knocked, the locking of the door, and the evasive answers were sufficient to establish probable cause to believe that there was evidence of marijuana in the apartment. Also properly considered was the evidence of marijuana observed in plain view after the officers instructed the defendant to open the door. The search warrant contained sufficient information to establish probable cause to believe marijuana was present therein notwithstanding the reference to the firearm, and was therefore valid as to marijuana. *DeJesus*, 439 Mass. at 627.

6. *Evidence of the gun.* While the external search of the bag was not lawful, and we excise the gun evidence resulting from the warrant referencing it, that evidence would still be admissible against the defendant if the police would have independently or inevitably discovered it pursuant to the search authorized by the excised search warrant. See *DeJesus*, 439 Mass. at 627-628 (court concluded that search warrant authorized by excised af-

---

[7]The defendant and Bryant were arrested after the protective sweep. No argument, however, has been made that the search of the apartment was incident to their arrest.

fidavit was "an independent source for the challenged evidence"); *McAfee*, 63 Mass. App. Ct. at 478-479 (reversing suppression of evidence because excised search warrant provided independent source for cash and baggies not discovered in course of improper limited search and excised search warrant and inevitable discovery doctrine allowed admission in evidence of gun initially found during improper limited search).

As in *DeJesus* and *McAfee*, we conclude that the gun evidence should not have been suppressed. The defendant "raises no claim that the police officers would not have sought a warrant had they not earlier entered the apartment." *DeJesus*, 439 Mass. at 627 n.11. The search for narcotics authorized by the excised warrant application would have certainly turned up the gun and ammunition evidence here. See *McAfee*, 63 Mass. App. Ct. at 480 (handgun would inevitably have been discovered by search warrant for cocaine and related paraphernalia because it was stored on same floor as cocaine and it was of same approximate size as items being sought under warrant). See also *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 (1989); *Commonwealth* v. *Perrot*, 407 Mass. 539, 548 (1990). And the character of the constitutional violation, an unauthorized feel of a bag, is not severe enough in these circumstances to require suppression. *McAfee*, 63 Mass. App. Ct. at 481.

> *Order allowing motion to suppress reversed.*