SOTO-SUAZO, COMMONWEALTH vs., 100 Mass. App. Ct. 460

 
 COMMONWEALTH vs. WILKIMS SOTO-SUAZO.

100 Mass. App. Ct. 460
 July 13, 2021 - October 25, 2021

Court Below: Superior Court, Middlesex County
Present: Green, C.J., Milkey, & Ditkoff, JJ.

 

Identification. Constitutional Law, Search and seizure. Search and Seizure, Warrant, Securing of premises, Probable cause, Consent. Probable Cause. Practice, Criminal, Motion to suppress.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence recovered following a warrantless search of the apartment of the defendant's girlfriend, where the officers lawfully entered the apartment, given that they had probable cause to believe that the apartment would contain evidence of the defendant's use of a false identity [463-465], and reasonable belief that someone would be inside the apartment and that failure to secure the evidence would result in its destruction (i.e., the girlfriend may have been tipped off about the search by other members of the defendant's drug organization) [465-467]; and where the girlfriend subsequently voluntarily consented to a search of the apartment [467-468].

INDICTMENTS found and returned in the Superior Court Department on March 24, 2016.

 A pretrial motion to suppress evidence was heard by C. William Barrett, J.

 An application for leave to prosecute an interlocutory appeal was allowed by David A. Lowy, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

 Bruce G. Linson for the defendant.

 Timothy Ferriter, Assistant District Attorney, for the Commonwealth.

 DITKOFF, J. The defendant, Wilkims Soto-Suazo, appeals from an order of a Superior Court judge denying a motion to suppress evidence recovered following a warrantless entry into his girlfriend's apartment. We conclude that the officers' entry was lawful because they had probable cause to believe that the apartment would contain evidence of the defendant's use of a false identity, and that they had a reasonable belief that failing to secure

 Page 461 

 that evidence would result in its destruction, as the defendant's associate informed the police that she had called another person in the defendant's organization while the police were searching her apartment. Further concluding that the motion judge properly found, based on the defendant's girlfriend's testimony, that she subsequently voluntarily consented to a search of the apartment, we affirm.

 1. Background. On December 4, 2015, a search warrant was executed in relation to a drug investigation in which the defendant was a suspect. The warrant authorized the search of four apartments: one in Medford, two in Malden, and one in Revere. It also authorized the search of four vehicles. The search was primarily for narcotics and evidence of drug trafficking, but it was also for evidence of the defendant's use of false identities. [Note 1]

 At the Medford location, Watertown Police Detective Mark Lewis [Note 2] arrested the defendant. As Detective Lewis arrested the defendant, he observed on the kitchen island two apartment keys with a Gold's Gym membership tag attached. [Note 3] When another detective contacted Gold's Gym and inquired about the membership associated with the gym tag attached to the keys, that detective was informed that the gym tag belonged to Josue Torres.

 Officers were aware that the defendant used the alias Josue Torres for "fraudulent documents," including on a New Jersey driver's license with a photograph of the defendant and to rent various apartments subject to the search warrant. The Medford apartment, where the defendant was arrested, was rented under the Torres alias and another woman's name.

 Around 6:30 a.m., as Malden Police Detective Renee Kelley executed the search warrant at one of the Malden apartments, on the first floor, she was informed by Jennifer Vasquez, an occupant of that apartment, that the defendant had a girlfriend who lived in the same building on the fourth floor. After being

 Page 462 

 shown a photograph of Maudelyn Cordero, the defendant's girlfriend, Detective Kelley "immediately" recognized her as someone who was "part of the investigation," and knew that one of the target vehicles of the search warrant was registered under her name. Vasquez pointed out the door of Cordero's apartment to several detectives. Cordero's apartment was rented under the same woman's name as the Medford apartment, where the defendant was arrested. The detective had seen the defendant enter the Malden apartment building previously. A maintenance worker told the detective that he believed Cordero had friends on the first floor. While the officers were in Vasquez's apartment, Vasquez made a phone call to the defendant's wife, identified as someone in the defendant's drug operation, warning her that the search was occurring.

 Subsequently, Detective Kelley notified Detective Lewis, who was arresting the defendant, that there might be a fifth apartment connected to the organization under investigation that had not been listed in the search warrant. Detective Lewis informed Detective Kelley that he had observed a set of keys as he was arresting the defendant, and he took custody of the keys. After the keys were transported to the Malden location, officers knocked and announced their presence, then entered Cordero's apartment with one of the keys. The officers entered the apartment "to secure the property."

 As they entered the apartment, Cordero came out of her bedroom. Detective Kelley brought her into the kitchen to explain why they were there. An officer spoke in Spanish to Cordero, which was the language that she felt most comfortable speaking. They explained to Cordero that she could either consent to a search of the apartment, or the officers could get a search warrant for it. The officers told her that, if they had to get a search warrant, she might be held responsible for what they found in the apartment. Around 9 a.m., Cordero signed a consent to search form and a Miranda form. She led the officers to her bedroom, and pointed to a dresser in that bedroom. Inside the dresser were bundles of cash. Cordero also pointed out the closet area, where the officers found drugs inside an electrical panel.

 The defendant moved to suppress, inter alia, evidence found during the warrantless search of Cordero's apartment. At the hearing on the motion to suppress, Cordero testified that she fully understood the officers, that she was not threatened by the officers, and that they were "correct and respectful." She stated that she wanted them to search the apartment, and that the officers' 

 Page 463 

statements that she may be held responsible for anything found in the apartment were they to get a search warrant did "[n]ot exactly" influence her decision to allow them to search "[b]ecause in [her] home, there was nothing for [her] not to allow them to search." The motion judge denied the defendant's motion to suppress, crediting Cordero's testimony. A single justice of the Supreme Judicial Court allowed this interlocutory appeal.

 2. Standard of review. "When reviewing the denial of a motion to suppress, we accept the motion judge's findings of fact absent clear error, but independently review the judge's ultimate finding and conclusions of law." Commonwealth v. Tejada, 484 Mass. 1, 7, cert. denied, 141 S. Ct. 441 (2020). Accord Commonwealth v. Dennis, 96 Mass. App. Ct. 528, 529 (2019). 

 3. Probable cause to enter and secure the apartment. a. Standard for entry. Because the officers entered Cordero's apartment prior to requesting her consent, we must first consider whether the police properly entered the apartment in the first place. "[A]ll warrantless entries into a home are presumptively unreasonable." Commonwealth v. Alexis, 481 Mass. 91, 97 (2018). One exception to that general principle is that, under certain circumstances, police may enter a home to secure it while they apply for a search warrant. See Commonwealth v. DeJesus, 439 Mass. 616, 621 (2003). "[T]here is a fundamental difference between securing or controlling the perimeter of a dwelling from the outside and the entry and physical surveillance of a dwelling from the inside." Commonwealth v. Owens, 480 Mass. 1034, 1035-1036 (2018), quoting DeJesus, supra. "We consider first whether the officers in the instant case had probable cause to believe that there was evidence of illegal [activity] in the apartment, and then whether they had specific information to support an objectively reasonable belief that evidence of the illegal activity would be removed or destroyed unless the police entered and secured the apartment prior to seeking a warrant." Commonwealth v. Streeter, 71 Mass. App. Ct. 430, 436 (2008). See DeJesus, supra ("We now hold that police officers who secure a dwelling while a warrant is being sought in order to prevent destruction or removal of evidence may not enter that dwelling, in the absence of specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken"). See also Commonwealth v. Arias, 481 Mass. 604, 615 (2019) ("when probable cause exists to believe that a crime has occurred, is occurring, or will occur imminently, warrantless entry is justified only if exigent circumstances also are present").

 Page 464 

 b. Probable cause. "In determining whether probable cause exists, 'we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men [and women], not legal technicians, act.'" Commonwealth v. Guastucci, 486 Mass. 22, 26 (2020), quoting Commonwealth v. Hason, 387 Mass. 169, 174 (1982). "[T]he probable cause inquiry is 'not a high bar.'" Guastucci, supra, quoting District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018). "Probable cause means a 'substantial basis' to conclude that 'the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time.'" Commonwealth v. Long, 482 Mass. 804, 809 (2019), quoting Alexis, 481 Mass. at 102.

 Here, there was probable cause to believe that evidence of crimes relating to the defendant's use of a false identity [Note 4] would be present in Cordero's apartment. [Note 5] While the defendant was being arrested at the Medford residence, Detective Lewis observed two sets of apartment keys and a Gold's Gym membership tag attached to the keys on the kitchen island. Detective Kelley was informed by Vasquez that the defendant had a girlfriend who lived in an apartment in the same building, and relayed this information to Detective Lewis, who seized the keys and had them brought to Cordero's apartment building.

 The defendant used the alias Josue Torres for "fraudulent documents." The officers found a New Jersey driver's license with a photograph of the defendant under the name Josue Torres and knew that he used that alias to rent various apartments subject to the search warrant. A detective was informed by a Gold's Gym staff member that the gym tag belonged to Josue Torres. The Medford apartment, where the defendant was arrested, was rented under the Torres alias and another woman's name. Cordero's apartment was rented under the same woman's name as the Medford 

 Page 465 

apartment. See Commonwealth v. Querubin, 60 Mass. App. Ct. 695, 699 (2004) ("The different address given by Ospina on the registration of the blue Chevrolet suggests additional concealment and may, when considered with Serna's use of a fictitious name, also suggest that the names on the lease did not reveal the true lessees"). Detective Kelley had seen the defendant enter the apartment building during the investigation. [Note 6] The defendant had previously been observed making controlled drug sales from Cordero's vehicle, while a woman (who was not identified) drove the vehicle. The officers entered the apartment at issue with one of the keys seized from the Medford apartment where they arrested the defendant. In combination with the evidence that warranted the search warrants for evidence of false identity in the other apartments, this new information provided the officers with probable cause to believe that evidence of the defendant's use of a false identity would be present in Cordero's apartment. See Commonwealth v. Andre-Fields, 98 Mass. App. Ct. 475, 483 (2020) (affidavit established probable cause that evidence of drug operation would be in apartment where it provided information that, among other things, defendant was staying at apartment and defendant was dating woman who lived there, "reject[ing] the argument that, because [the defendant] may have been living in two locations, evidence of his drug activity would not be found in the apartment"); Streeter, 71 Mass. App. Ct. at 437 (strong odor of marijuana emanating from inside apartment, admission from defendant that he had smoked marijuana, and his nervousness and evasive behavior provided probable cause to believe there was marijuana in apartment). Contrast Arias, 481 Mass. at 620-622 (although fact that 911 caller heard man load gun before entering building was "troubling," where caller also stated that "men talked calmly," that she never saw men before, and that they entered building "easily," and caller changed her story about number of men who entered building and "officers discovered no corroborating evidence of criminal conduct," no probable cause to enter apartment).

 c. Destruction of evidence. "A prerequisite for securing a dwelling from within requires 'an objectively reasonable belief

 Page 466 

 that someone is inside.'" Streeter, 71 Mass. App. Ct. at 437-438, quoting DeJesus, 439 Mass. at 624. Additionally, officers must have "specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed." Owens, 480 Mass. at 1036, quoting DeJesus, 439 Mass. at 621.

 The officers had reason to believe that someone would be inside Cordero's apartment. This is not a case where the police observed the residents of a home leave, see Commonwealth v. Gray, 465 Mass. 330, 345, cert. denied, 571 U.S. 1014 (2013), or where "the apartment appeared to be unoccupied" because the occupants had been arrested elsewhere, see DeJesus, 439 Mass. at 617-618, 620 n.3. Rather, the police had intentionally chosen to execute the search warrants in the "very early morning hours" because that was "when it was most likely that people would be home." The police had previously observed a Hispanic woman driving a vehicle registered to Cordero with small children in the vehicle, so they expected (correctly) that a mother and child lived there. Given this information, it was objectively reasonable to believe that the apartment would be occupied in the early morning hours. See Streeter, 71 Mass. App. Ct. at 438 (police knew someone was inside apartment because of defendant's admission). [Note 7]

 Additionally, the officers had reason to believe that evidence within the apartment relating to the defendant's false identity would be removed or destroyed. Vasquez, who lived in the same building and informed Detective Kelley about Cordero's apartment, also admitted that, while the police were searching her apartment, she "reach[ed] out to the defendant's wife," who was "someone else in the organization," warning her of the searches. Further, Detective Kelley spoke to a maintenance worker in the building, who stated that Cordero, the occupant of the fourth-floor apartment at issue, "had friends on the first floor." Detective Kelley had surveilled Cordero throughout the investigation, and her car was searched pursuant to the warrant. It was reasonable to believe that, because the defendant's alias was being used in connection with the drug operation, there may be efforts to destroy any evidence of the alias's existence in Cordero's apartment, especially where she may have been tipped off about the 

 Page 467 

search by other members of the organization. See Commonwealth v. Parker, 481 Mass. 69, 73 (2018) (exigent circumstances to seize defendant's clothes without warrant while in custody because reasonable to believe he might attempt to hide or destroy evidence of crime existing on his clothing while in custody); Streeter, 71 Mass. App. Ct. at 438 (there was "'specific information' to support" belief marijuana would be removed or destroyed where, after knocking on door, police heard running sounds in apartment, and defendant made conflicting statements about who was inside and locked himself and officers out of apartment during conversation). Contrast Owens, 480 Mass. at 1036, quoting DeJesus, 439 Mass. at 621 ("generic explanations -- the only references in the testimony to the possible loss or destruction of evidence -- do not amount to 'specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed'" where there was no evidence occupants were aware of police presence); Commonwealth v. Tyree, 455 Mass. 676, 686 (2010) ("no evidence suggests that the occupants were aware of the police presence during that time, and no evidence suggests that they had any incentive to remove or destroy evidence, or that they might be in the process of doing so").

 4. Consent to search. "In general, a search of a home without a warrant is invalid, but one exception is when the search is conducted with valid 'consent.'" Commonwealth v. Hernandez, 93 Mass. App. Ct. 172, 174 (2018), quoting Commonwealth v. Rogers, 444 Mass. 234, 236-237 (2005). "The Commonwealth bears the burden of proving that consent was freely and voluntarily given. . . . Consent is free and voluntary where it is 'unfettered by coercion, express or implied,' and must be more than mere 'acquiescence to a claim of lawful authority.'" Commonwealth v. Colon, 482 Mass. 162, 185 (2019), quoting Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995). "Whether consent is free and voluntary is to be determined from all of the circumstances." Commonwealth v. Yehudi Y., 56 Mass. App. Ct. 812, 816-817 (2002). "Because a finding of voluntariness is a question of fact, it should not be reversed absent clear error by the judge." Commonwealth v. Carr, 458 Mass. 295, 303 (2010).

 Here, Cordero's testimony, which the judge credited, demonstrated that the consent she gave the officers to search the apartment was free and voluntary. Cordero testified that the officers were "correct and respectful." An officer was present to communicate 

 Page 468 

with Cordero in Spanish, and she understood everything that he was saying. She was read her Miranda rights, and she stated that she understood them. She signed a consent to search form, and permitted the officers to search the apartment. Cordero led the officers to the dresser and the closet, where the money and the drugs were found.

 Although there was evidence that an officer told Cordero that, if they were forced to get a search warrant, any contraband in the apartment may be attributed to her, Cordero testified that that statement did not influence her decision to consent to the search. [Note 8] "The mere mention of the possibility of obtaining a search warrant in lieu of obtaining . . . consent [is] insufficient to rob . . . consent of its validity." Commonwealth v. Farnsworth, 76 Mass. App. Ct. 87, 93 (2010). See id. (officers identified themselves as such, told defendant's mother about object of search, provided consent form, and told her she did not need to consent; despite stating they would obtain warrant if she did not consent, consent was voluntary). Cordero also testified that she consented to the search because she "agreed to and wanted them to search the apartment." As the judge credited Cordero's testimony "with respect to the fact that she never felt threatened or intimidated by the police into allowing them to search her apartment," her consent was voluntary. See Commonwealth v. Neves, 474 Mass. 355, 360 (2016), quoting Commonwealth v. Moon, 380 Mass. 751, 756 (1980) ("The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court"). [Note 9]

Order denying motion to suppress affirmed.

FOOTNOTES
[Note 1] A Superior Court judge subsequently found that there was no probable cause to search for narcotics in any of the apartments, but that there was probable cause to search for evidence of the use of fraudulent identities in two of the apartments and for phone records. Accordingly, the judge suppressed the evidence discovered in the search of the apartments except for records of use of fraudulent identities and phone records. The judge denied the motion to suppress regarding the search of the vehicles. 

[Note 2] Detective Lewis was part of the Suburban Middlesex County Drug Task Force, a regional task force. 

[Note 3] Throughout the investigation, the officers had observed the defendant at a Gold's Gym. 

[Note 4] The Commonwealth made no argument in the Superior Court, and makes no argument here, that there was probable cause to believe that evidence of drug dealing would be present in Cordero's apartment at the time of the entry. 

[Note 5] Because we hold that there was probable cause to believe that evidence of the defendant's use of a false identity was inside the apartment, there was reasonable suspicion to permit officers to insert the key into the lock of the apartment to see whether the key fit in the lock. See Commonwealth v. Dora, 57 Mass. App. Ct. 141, 143 (2003), quoting Commonwealth v. Alvarez, 422 Mass. 198, 209-210 (1996) (police need "only a founded or reasonable suspicion to insert the key" to see whether it fits). 

[Note 6] Cordero testified that the defendant "practically always" stayed at her apartment at night. The Commonwealth does not dispute the proposition that this gave the defendant standing as a "frequent overnight guest" to challenge the search of the apartment. Commonwealth v. Polanco, 92 Mass. App. Ct. 764, 769 n.6 (2018). 

[Note 7] Although Detective Kelley testified that "[w]e had no information if anyone was in there," the relevant question is whether there was "an objectively reasonable belief that someone" was in the apartment, not the detective's subjective belief. Streeter, 71 Mass. App. Ct. at 438, quoting DeJesus, 439 Mass. at 624. 

[Note 8] When asked whether the possibility of prosecution impacted her decision to consent, Cordero said, "Not exactly," "[b]ecause in my home, there was nothing for me not to allow them to search." 

[Note 9] The defendant cites several cases to support his proposition that consent may not be obtained by a promise of leniency. See Commonwealth v. O'Brian, 445 Mass. 720, 725, cert. denied, 549 U.S. 898 (2006); Commonwealth v. DiGiambattista, 442 Mass. 423, 435-439 (2004); Commonwealth v. Meehan, 377 Mass. 552, 564-565 (1979). These cases, however, discuss the voluntariness of a confession. Although a suggestion that a confession will result in leniency may cause a confession to be involuntary, see, e.g., Commonwealth v. Williams, 486 Mass. 646, 661 (2021), there is no support in the case law for the proposition that the police may not obtain consent for a search through truthful assurances to the person consenting. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.